In the
**UNITED STATES DISTRICT COURT**
for the **SOUTHERN DISTRICT OF INDIANA,**
INDIANAPOLIS DIVISION

| | |
|---|---|
| **JEFFREY G. MYERS**, )<br>)<br>Plaintiff, )<br>)<br>*vs*. )<br>)<br>**BRIGGS & STRATTON CORP.** and )<br>**TRACTOR SUPPLY, INC.**, )<br>)<br>Defendants. ) | CAUSE NO.  1:09-cv-0020-SEB-TAB |

## E N T R Y

### Defendants' Motion for Summary Judgment (doc. 53)

Plaintiff Jeffrey Myers claims that he injured his shoulder while attempting to start a log splitter.  Contending that a defect in the engine powering the splitter was the cause of his injury, he sues the engine manufacturer and the retailer from whom he purchased the splitter for damages under Indiana's product-liability law.  Defendants now move for summary judgment on all claims and, for the reasons explained herein, their motion is granted.

In May 2006, Mr. Myers purchased a "Huskee" brand 35-ton[1] log splitter from Defendant retailer Tractor Supply, Inc. for approximately $1,500.  Plaintiff's Answers to Tractor Supply's Interrogatories (doc. 55-1) ("TS Interrog.") no. 4.  The log splitter was powered by a 12½-horsepower engine manufactured by defendant Briggs & Stratton.[2]  TS Interrog. no. 3.  Soon

---

[1] "35-ton" refers to the "splitting force," the amount of pressure with which the splitting wedge, which is attached to a hydraulic pump, hits the logs.

[2] Originally, Mr. Myers also sued MTD Products, Inc. as the manufacturer of the log splitter.  Complaint (doc. 2-2) ¶ 2.  Explaining that, "after investigation, it has been determined

after purchasing the log splitter, Mr. Myers experienced a problem with starting the engine: about 80% of the time when he pulled the starting cord, the engine would backfire and the cord would abruptly stop or lock up about halfway through the pull, jerking the handle out of his hand as he was in the swing of his pull.  Myers Deposition (docs. 55-2 and 94-1), pp. 34, 36, 38-41. The pull cord would retract normally into the engine after the abrupt stops, *id.*, p. 40-41, 82, but it broke on three or four of these occasions and Mr. Myers replaced the cord himself, *id.*, p. 45; TS Interrog. no. 2.  Mr. Myers testified that he felt that the cord did not "snap back;" rather, it would only stop abruptly.  *Id.*, p. 82-84.[3]  Mr. Myers averred that the "backfire/kickback" was "something not out of the ordinary for that type of engine."  Myers Affidavit (doc. 85-2) ¶ 4. The engine's performance, including the backfires and abrupt stops, was consistent up to December 1, 2006, the date of his injury, and was not of the level that caused injury or required medical treatment.

Sometime in August or September of 2006, Mr. Myers inquired at Tractor Supply about obtaining an electric starter for the engine.  Myer Dep. p. 43-44.  When asked why he wanted

---

that MTD Products, Inc. is not involved in the manufacturing of the equipment in question[]," Mr. Myers sought leave to dimiss MTD Products with prejudice, Motion to Dismiss (doc. 18), and his motion was granted, (doc. 22).  Apparently, the Huskee brand log splitters are manufactured by MTD Products and sold exclusively through Tractor Supply.  It is not clear whether, in saying that he determined that MTD Products did not manufacture "the equipment in question[]," that Mr. Myers meant the log splitter as a whole or only the component engine that he alleges caused his injury.

[3] Although Mr. Myers was aware of information from an unknown source indicating that a backfire might cause a pull cord to actively recoil or pull back toward the engine, Myers Dep., pp. 82-83, he was clear that he felt that the pull cord only stopped abruptly, *id.*, pp. 83, 84.  He did not testify that he was pulled back toward the engine, that his fingers or hands impacted the engine or log splitter on recoil, or that he sustained any injury due to a forceful recoil of the pull cord.  He testified only that the pull cord would roll itself back into the engine if the recoil spring wasn't broken.  *Id.*, p. 82.

one, Mr. Myers answered that it was because of the backfiring. *Id*. He decided against purchasing the starter because of the $800 to $850 price, not including installation costs. *Id*., p. 44. He saw no reason to take the log splitter somewhere for repairs because he had not been injured and the engine continued to operate. Myers Aff. ¶ 9.

The initial backfires and abrupt stops on starting did not have a significant effect on Mr. Myers. He testified that the abrupt stop hurt his hand, Myer Dep. p. 40, but he did not sustain any injury, *id.*, p. 41. He averred that, before December 2006, the engine's behavior "was not of the level that caused injury and/or required medical treatment. " Myers Aff. ¶ 5. Some time in the summer of 2006, during a normal doctor's visit, Mr. Myers mentioned to his doctor that he had a non-constant ache in his shoulder, Myers Dep., pp. 58-59, but he said that, before December 2006, that pain or ache was minimal and only a temporary discomfort that did not require medical treatment, Myers Aff. ¶ 8.

Mr. Myers alleges that he sustained his shoulder injury as a result of attempting to start the log-splitter's engine on December 1, 2006. Myers Dep., pp. 45, 84; Myers Aff. ¶ 11. The nature of his injury was not explained on the present motion.[4] Also unclear is the nature of the accident. Mr. Myers testified that he "went to pull the thing to start it, and it backfired so hard that the whole top cowling of the motor came ripping off." Myers Dep., p. 45. See also, TS Interrog. no. 2 ("In December 2006 the log splitter backfired so hard it tore the top cowl off the

---

[4] In one of the interrogatory responses submitted on this motion, Mr. Myers stated that, after the incident, he was "in extreme pain," although he does not identify his shoulder as the location of the pain. TS Interrog. no. 2. He answered another interrogatory asking for details of his physical damage by attaching doctors' statements, *id.* no. 29, which were not submitted on this motion.

motor . . . .") He averred that starting the engine "resulted in a significantly different and much more severe kickback and backfire than I had ever experienced since its original purchase" and "the engine for the first time kicked back so severely that my shoulder was injured and the pull start assembly and cowl flew off the engine." Myers Aff. ¶¶ 10 and 11. After describing the problems that he experienced with engine starts before December 2006 as abrupt stops of the pull cord about half-way through its length, without a forceful recoil, he affirmed that that was "exactly what happened" on December 1, 2006, "but on a worse level." Myers Dep., p. 84. It is unclear how an abrupt stop of an engine pull cord could be "worse." It is not explained how a backfire is "harder" or "more severe" or how a harder backfire relates to whatever process injured Mr. Myer's shoulder. In the evidence presented on this motion, Mr. Myers does not describe the pull cord as forcefully recoiling, pulling, or jerking back on his shoulder, or as stopping any sooner or later than the approximately half-way point he regularly experienced before. It is simply unclear on the evidence presented on this motion what happened with the engine on December 1, 2006 and how Mr. Myers' shoulder was injured thereby.

Mr. Myers contended in his discovery responses that the defect in the engine that caused his injury was a "[f]aulty pull by maker of engine," TS Interrog. no. 10, and the "[c]am eccentric broke because the flywheel was too lightweight to start the motor." TS Interrog. nos. 11 and 12. Myers Aff., ¶ 13 ("under weight fly wheel"). In his argument on the present motion, Mr. Myers' only contention is that the defect was an underweight flywheel. Response (doc. 85), Statement of the Facts, ¶ 4, p. 2 ("an under weight fly wheel was used on the engine manufactured by Briggs & Stratton"); ¶ 19, p. 3 ("Plaintiff learned of the defect in the engine (under weight fly wheel) . . ."); ¶ 21 (same).

4

Mr. Myers also alleges that, by the time of his purchase of the log splitter and by the time of his injury, both Briggs & Stratton and Tractor Supply knew that the engine was defective when installed as part of the log splitter but Tractor Supply sold it to Mr. Myers without making necessary repairs and both defendants made no attempt to notify consumers of the defect. As evidence of their knowledge, Mr. Myers relies on two items. The first is a January 2006 service bulletin issued by Briggs & Stratton and received by Tractor Supply that addresses a condition of "hard starting and/or kickback" "with Rewind Starters" on certain of its engines. This service bulletin describes an eight-step process of inspections and repairs, including possible replacement of the flywheel. (Docs. 85-3 and 85-4). Mr. Myers also relies on documents relating to April and May 2006 complaints made by an Illinois consumer to the office of the Illinois Attorney General and the United States Consumer Product Safety Commission regarding a starting kickback problem with a log splitter incorporating a 10½-horsepower Briggs & Stratton engine. (Docs. 85-4 and 85-5). These documents were produced in discovery by Tractor Supply. (Doc. 85-4, pp. 1-2). Mr. Myers alleges that, with this knowledge of the engine's defect, Tractor Supply was negligent in failing to make the necessary repairs indicated in the Service Bulletin before selling the log splitter and both Tractor Supply and Briggs & Stratton were negligent in not giving him notice of the defect and the necessary repairs. TS Interrog. nos. 12, 15, 16; Response at 3, Statement of the Facts ¶ 18.

There is a surprising lack of clarity about the claims that Mr. Myers asserts. His original, and still-operative, state-court complaint in six paragraphs mentions only negligence claims: it alleges that MTD Products, Inc. and Briggs & Stratton "negligently manufactured" the log splitter, Complaint, ¶ 2; that Tractor Supply "negligently allowed the sale of the defective log

splitter," *id.*, ¶ 4; and that Briggs & Stratton's engine "negligently malfunctioned," *id.*, ¶ 5.[5] The Complaint neither mentions the Indiana Products Liability Act ("IPLA"), Ind. Code Ann. § 34-20-1-1, *et seq.* (Burns 2008), nor indicates whether Mr. Myers asserts a design-defect and/or a failure-to-warn claim in addition to negligent manufacture and, apparently, Defendants did not seek clarification during discovery. Defendants' summary-judgment arguments assume that Mr. Myers' claims are under the IPLA and they address its provisions. In response, however, Mr. Myers ignores the IPLA; emphatically states that "[t]here are no allegations that this case involves strict tort liability on behalf of the Defendant . . .", (Response at 10); and repeatedly asserts that his is a simple negligence suit.

The IPLA "governs all actions that are: (1) brought by a user or consumer; (2) against a manufacturer or seller; and (3) for physical harm caused by a product; regardless of the substantive legal theory or theories upon which the action is brought." I.C. § 34-20-1-1. Because Mr. Myers failed to distinguish his claims from this definition, they are governed by the IPLA. The development of product-liability law in Indiana has been somewhat non-linear and, at certain stages of that development, plaintiffs were able to assert both negligence and IPLA claims at the same time. However, since the 1995 amendments to the Act, all product-liability tort claims are governed by the IPLA. See James L. Peterson, "Tort Reform, Act No. 1741," 39 *Res Gestae* 24 (Sept. 1995). And while Mr. Myers simultaneously insists that he is asserting a manufacturing-defect claim but not a strict-liability claim, it is clear under the IPLA that strict

---

[5] The Complaint also includes a claim pursuant to the warranty that came with the log splitter, Complaint, ¶ 3, but all claims based on breach of express or implied warranties were subsequently dismissed with prejudice by stipulation of the parties, Order on August 24, 2009 Pretrial/Settlement Conference (doc. 42).

liability applies to only manufacturing-defect claims, not to design-defect or failure-to-warn claims.  I.C. §§ 34-20-2-1 and 34-20-2-2(2).

While Mr. Myers explicitly alleges and argues only a manufacturing-defect claim against Briggs & Stratton, his Response also fairly asserts a failure-to-warn claim.  (Response at 12 and 13).[6]  In addition, although Mr. Myers does not explicitly assert a design-defect claim and consistently labels Briggs & Stratton's underweight flywheel as a manufacturing defect, we will assume for the purposes of Defendant's motion that Mr. Myers also asserts a design-defect claim, *i.e.*, that Briggs & Stratton designed a too-light flywheel for its engine.

## Discussion

Summary judgment should be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c)(2).

Briggs & Stratton, joined by Tractor Supply, argue that they are due summary judgment on four grounds:  (1) Mr. Myers incurred or assumed the risk of his injury by continuing to use the log splitter while knowing of its propensity to backfire or kickback on starting and cause shoulder injury; (2) Mr. Myers lacks the required expert testimony to prove proximate causation; (3) Mr. Myers cannot show a violation of industry or governmental standards; and (4) Briggs &

---

[6] "Never at any time did Briggs & Stratton or Tractor Supply put Plaintiff on notice of the problem with the Briggs & Stratton engine.  Had they done so, a repair would have been completed and Plaintiff would have had no injuries whatsoever."  (Response at 12).  "Tractor Supply did nothing to correct the defect while the log splitter was in its possession and prior to its sale to Plaintiff, nor did Tractor Supply take any steps to put Plaintiff on notice of the defect after its sale of the unrepaired log splitter to Plaintiff."  (*Id.* at 13).

Stratton did not manufacture the log splitter or determine the specifications of the engine. Because we find the second ground meritorious and fully dispositive, we do not address the other grounds.

Whether he alleges a manufacturing defect, design defect, or a failure to warn, Mr. Myers must prove proximate causation, *i.e.*, that the defect or missing warning proximately caused his injury. *Kovach v. Caligor Midwest*, 913 N.E.2d 193, 197-98 (Ind. 2009); *U-Haul Int'l, Inc. v. Nulls Machine and Mfg. Shop*, 736 N.E.2d 271 (Ind. Ct. App. 2000); *Natural Gas Odoerizing v. Downs*, 685 N.E.2d 155, 160 (Ind. Ct. App. 1997).

> "Proximate causation" has two components: causation-in-fact and scope of liability. To establish factual causation, the plaintiff must show that but for the defendant's allegedly tortious act or omission, the injury at issue would not have occurred. The scope of liability doctrine asks whether the injury was a natural and probable consequence of the defendant's conduct, which in the light of the circumstances, should have been foreseen or anticipated.

*Kovach*, 913 N.E.2d at 197-98 (citations omitted). When the question of causation is not within the common understanding and experience of a lay jury, expert testimony is required. *Owens v. Ford Motor Co.*, 297 F.Supp.2d 1099, 1103-04 (S.D. Ind. 2003).

Mr. Myers alleges that the product defect that caused his injury was an underweight flywheel — whether Defendants mis-manufactured it, negligently designed it, or failed to warn him about it. Defendants argue that "[a]lthough most people are familiar with small engines, the manner in which the flywheel and other components operate within an internal combustion engine is beyond their knowledge or understanding." (Brief in Support (doc. 54) at 11). We agree. We also find that Mr. Myers has not presented evidence, expert or lay, that the flywheel was the cause-in-fact of his injury. Mr. Myers does not dispute Defendants' contention that the

operation of the log-splitter's engine and any relationship between the flywheel, backfires/kickbacks, abrupt stops of the pull cord, and his shoulder injury are beyond the experience and knowledge of a law jury. Instead, he argues that additional expert testimony is not required in this case:

> Plaintiff took the engine to an authorized Briggs & Stratton Sales and Service dealer. He learned that in fact the engine had a defect (under weight fly wheel) and in fact the dealership would repair the engine at no cost to Plaintiff.
>
> Further, at the Settlement Conference Defendant first had knowledge that a Service Bulletin from Briggs & Stratton concerning a defect in the engine had been sent to Tractor Supply. A copy of that notice was displayed to Plaintiff at the Settlement Conference. Never at any time did Briggs & Stratton or Tractor Supply put Plaintiff on notice of the problem with the Briggs & Stratton engine. Had they done so, a repair would have been completed and Plaintiff would have had no injuries whatsoever.
>
> The existence of the Service Bulletin in and of itself shows that corrective measures were required by Briggs & Stratton to correct a condition in the engine.

(Response at 12 (citations omitted)). In September 2009, Mr. Myers named an individual from D & D Mower & Engine, the shop that repaired his log splitter after his injury, as an expert witness. (Doc. 44). In November 2009, Mr. Myers filed notice that the individual would be only a fact witness regarding the content of the Briggs & Stratton service bulletin and the repairs that he effected to Mr. Myers' engine. (Doc. 46). Therefore, Mr. Myers' only evidence that the flywheel was "defective" under the IPLA is the repairman's testimony about the facts of his repairs and the content of the service bulletin. Neither is sufficient to establish a defect or causation.

The service bulletin does support an assertion that the flywheel is underweight or that it caused Mr. Myers' injury. The bulletin is directed at the condition of "hard starting and/or kickback" and "Hard Starting with Rewind Starters." (Doc. 85-3 and 85-4). It lists five

sequential steps to inspect for and fix the condition: (1) determine by slowly pulling the cord whether anything is preventing engine rotation; if no problem is detected, then (2) check, and adjust if necessary, the intake and exhaust valve clearances; if that did not correct the problem, then (3) check, and adjust if necessary, the armature air gap and replace the flywheel key if sheared; if that did not correct the problem, then (4) if the flywheel key was not sheared, then replace the flywheel; if that did not correct the problem, then (5) replace the camshaft.

There are several reasons why this service bulletin cannot substitute for the required expert testimony on causation. First, the service bulletin does it state that the originally installed flywheels are underweight, it does not indicate that the replacement flywheels are heavier, and it does not indicate any fault — weight or otherwise — with the flywheels; the bulletin merely directs their replacement without any indication of how the replacement flywheel differs in a way related to hardstarting and/or kickbacks. Second, the service bulletin does not state that hard starting and/or kickbacks are a particular fault with this engine. The bulletin only provides a process for inspecting and repairing a condition of hardstarting and/or kickbacks, without stating or implying how common the condition is or even whether it is caused by manufacturing or design defects as opposed to damage or wear resulting from operation of the engine. It is indeterminable on the face of the service bulletin whether defects in engine rotation, valve clearances, armature air gaps, flywheel keys, flywheels, or cam shafts could have been caused only by original defects in manufacturing or design or could have been caused during use of the equipment. Third, the service bulletin does not indicate how often the flywheel is the cause of hardstarting and/or kickbacks. The bulletin lists four possibilities for correction of the condition before replacement of the flywheel (mechanical prevention of engine rotation, improper valve

clearances, improper armature air gap, and sheared flywheel key) and, if flywheel replacement is ineffective at fixing the condition, cam-shaft replacement is directed.  Thus, the bulletin is evidence that there could be five other explanations for the condition of hardstarting and/or kickbacks instead of the flywheel (regardless of its weight).  Fourth, the bulletin is targeted at the condition of hardstarting *and/or* kickbacks.  Mr. Myers apparently contends that he was injured by a process related to his engine's backfires or kickbacks causing the pull cord to abruptly stop; he does not allege that he was injured by the need to repeatedly pull the cord to start the engine.  By using "and/or" connecting hardstarting and kickbacks as the condition(s) at which the service bulletin is directed, it is even more uncertain what the role of the flywheel is in causing kickbacks.

All of these causation issues require expert testimony.  Factual testimony from the D & D Mower and Engine mechanic about replacing Mr. Myers' flywheel according to the instructions of the service bulletin will not substitute for expert testimony.  Granting that the repairs, including flywheel replacement, were effected and were effective, it is still unknown whether the flywheel's weight caused the problem that caused Mr. Myers' injury.  The mechanic's personal opinion that Briggs & Stratton's flywheel was too light *and* that it caused Mr. Myers' injury is uninteresting and insufficient if he is not qualified as an expert.

### Conclusion

Because Mr. Myers does not have required expert testimony on the essential element of proximate causation, Defendants' motion for summary judgment is **GRANTED**.

**SO ORDERED**.

11

Date:  04/16/2010

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Patrick C. Badell
BADELL & WILSON
bwlaw@bwlawoffice.com

Donald H. Carlson
CRIVELLO CARLSON S.C.
dcarlson@crivellocarlson.com

Robert R. Clark
TAFT STETTINIUS & HOLLISTER LLP
rclark@taftlaw.com

Jeffrey T. Nichols
CRIVELLO CARLSON, S.C.
jnichols@crivellocarlson.com

Sawyer Nicole Thorp
TRAVELERS STAFF COUNSEL OFFICE
sthorp@travelers.com

Daniel David Trachtman
WOODEN & MCLAUGHLIN LLP
dtrachtman@woodmaclaw.com

Ronald L. Wilson
BADELL & WILSON
bwlaw@bwlawoffice.com